

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

**OCT 17 2003**

CLERK, U.S. DISTRICT COURT
By:_____ Deputy

| | | |
|---|---|---|
| LARRY DONELL DAVIS, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:03-CV-0001 |
| | § | **CAPITAL LITIGANT** |
| | § | |
| DOUG DRETKE, Director | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| Respondent. | § | |

**RESPONDENT DRETKE'S
ANSWER WITH BRIEF IN SUPPORT**

Petitioner Larry Donnell Davis was properly convicted and sentenced to die in Texas state court for the capital murder of Michael Jerome Barrow. He now challenges his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254. However, he has failed to demonstrate that he is entitled to relief. The Director denies all allegations of fact made by Davis, except those supported by the record and those specifically admitted herein.[1]

**PETITIONER'S ALLEGATION**

In this federal habeas proceeding, Davis alleges one constitutional violation:

Davis' rights were violated under the Fifth and Fourteenth Amendments to the United States Constitution when the State commented on Davis' silence during the closing argument at the guilt/innocence phase of trial.

Davis also makes a cursory request for an evidentiary hearing, "should the Court

---

[1]     A copy of Davis' state court records will be forwarded to this court under separate cover, at a later date.

require further evidence that may not appear in the record." Petition at 21. However, his requests for relief and an evidentiary hearing must fail. The state court's denial of relief was neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court; thus, his request for federal habeas relief cannot be granted. Furthermore, Davis fails to demonstrate entitlement to an evidentiary hearing, under the federal habeas corpus statute, and likewise fails to demonstrate a factual dispute which, if resolved in his favor, would entitle him to relief.

## STATEMENT OF THE CASE

Davis was convicted for the capital murder of Michael Barrow on March 19, 1999, and sentenced to death on March 27, 1999. 2 Tr$^2$ 306, 319-25. His conviction and sentence were affirmed by the Court of Criminal Appeals in *Davis v. State*, No. 73,458 (Tex. Crim. App. October 23, 2002) (unpublished). His conviction became final on April 28, 2003, when the United States Supreme Court denied his petition for writ of certiorari. *Davis v. Texas,* 123 S. Ct. 1910 (2003). Davis filed his state petition for writ of habeas corpus on June 17, 2002. The Texas Court of Criminal Appeals denied relief on December 18, 2002, adopting the trial court's findings of fact and conclusions of law. *Ex parte Davis*, No. 54,457-01 (Tex. Crim. App. Dec. 18, 2002) (unpublished); *see also* SHTr 135-46.

Davis filed his federal petition for writ of habeas corpus on July 31, 2003. This Court entered a scheduling order on September 18, 2003, requiring the Director to file an answer by October 28, 2003. The Director's timely answer follows.

---

[2]    "Tr" refers to the transcript of documents on file with the court in Davis' state trial, preceded by volume number and followed by page numbers. "SR" refers to the state record of transcribed trial proceedings, preceded by volume number and followed by page numbers. "SHTr" refers to the state habeas record. "SX" refers to State's Exhibit, followed by the number.

## STATEMENT OF FACTS

### I.  Facts of the Crime

In addition to the overwhelming evidence of Davis' guilt presented by the State, Davis gave a fourteen page confession which was admitted at trial and which contained the following details. According to Davis, he was approached by his friends brothers Ray ("Ray-Ray") and Donald Drew ("Drew"). 36 SR 59. Drew and Ray-Ray were low on money and Ray-Ray was supposed to earn his "teardrop."[3] They indicated that Michael Barrow was the intended victim of their plan to get money and for Ray-Ray to earn his teardrop. Drew told Davis that they could not have Drew's car at Barrow's house and asked Davis if they could use his. They elicited Davis' help by telling him that Barrow had wheels that would look good on Davis' car and a stereo system that Drew indicated he would give Davis for his help. They asked Davis if wanted to "hassle" and Davis said, "I'm down." 36 SR 60.

First, Davis, Drew, Ray-Ray and "some youngster" drove around "scoping" out Barrow's house because Barrow's girlfriend was there. 36 SR 60. Barrow's car was parked in the driveway. When Barrow's girlfriend left, Davis and the others went to Davis' car. Ray-Ray rode with Drew and they followed Drew and "the youngster." Another car was driven by "another youngster." The two "youngsters" were supposed to park a block away and serve as lookouts. When everyone got within a block of the house, Drew jumped in the backseat of Davis' car. Ray-Ray, Drew, and Davis knocked on the door and then went into Barrow's house under the guise that they were there to visit. 36 SR 60. Barrow served them chips and they all listened to rap tapes and watched videos. Then Davis began lifting Barrow's weights. The plan was for Drew to also lift weights, but to eventually knock Barrow down with the weights. While Barrow was sitting on the couch, Davis attempted to distract him; Drew then hit Barrow in the back of the head with a set of dumbbells. Barrow

---

[3]  Mary Katherine Davis, Davis' ex-wife, testified that she knew Drew and Ray-Ray to be members of a gang called the "Crips" and that a teardrop tattoo was a gang symbol. 38 SR 13-14. According to Davis, a teardrop evidences status in a gang. *Id.*

3

fell to one knee on the floor and Davis helped him back to the couch and tied his hands behind his back with Drew's bandana.[4] Davis told Barrow that nobody was going to hurt him. Davis told Ray-Ray to take Barrow to the bathroom. 36 SR 61. He also covered Barrow's face with a shirt. 36 SR 62. Drew then called Davis into the living room and told Davis that he had "just done a murder" two or three weeks before and that he could not watch his brother do it. Drew told Davis that things had already gone too far because Barrow already knew Drew and Ray-Ray. He also told Davis that Ray-Ray "needed to handle his business, meaning that Ray-Ray had to kill the white dude." 36 SR 62. Ray-Ray asked Davis for his knife and Davis gave it to him. Drew then took some cassettes and left. Ray-Ray was standing over Barrow trying to get the nerve to kill him. 36 SR 62-63. Davis went to the closet and started looking for the items he wanted. Davis told Ray-Ray to "take care of his business." 36 SR 63. Ray-Ray asked Davis to "show me how." According to Davis, Ray-Ray was reluctant to do the actual killing. Davis asked him, "Are you going to do it or not?" *Id.* Davis told him, "You are talking that you want your teardrop." *Id.* Davis also told Ray-Ray, "You both already hit him, he knows y'all." *Id.* Ray-Ray then stabbed Barrow in the neck. 36 SR 64. When the knife did not seem to affect Barrow, Ray-Ray began to punch him and stab him on the right side of the throat. Barrow began to struggle and the knife broke. Then Davis handed Ray-Ray a "little ice pick" and Ray-Ray continued to stab Barrow. 36 SR 65.

Davis and Ray-Ray next began looking around the house and Barrow's car for speakers but did not find them. 36 SR 65-66. They began to gather a TV and VCR when they heard Barrow cough. Davis and Ray-Ray went back to Barrow and discovered that he had undone his feet which had also been tied. At this point Barrow tried to put up a fight. Davis hit him in the mouth and held him down while Ray-Ray hit him with a pipe. 36 SR 66. When Barrow continued to crawl around, Davis retrieved a butcher knife out of one of

---

[4]     A blue bandana was discovered near Barrow's body.

the kitchen drawers and gave it to Ray-Ray who began to stab Barrow with it. 36 SR 67. They were still not sure that Barrow was dead so Ray-Ray started kicking him in the ribs. Davis told Ray-Ray to "do what I say." 36 SR 67. He instructed Ray-Ray to position himself on Barrow's neck and Ray-Ray did. 36 SR 67. Davis admitted that both he and Ray-Ray got blood on their shoes during the murder. 36 SR 67. They then left with Barrow's property. 36 SR 67. In the remainder of his confession, Davis gave details about the days immediately following Barrow's murder, including his attempts to pawn some of the property and conceal other property. 36 SR 68-72.

The medical examiner testified that Barrow received multiple blunt force injuries to the head, as well as blunt force trauma to the chest, sufficient to cause rupture to the heart. 35 SR 158-59, 165-69. These injuries could have been caused by kicking or hitting. 35 SR 163, 165. The body also exhibited lacerations and puncture wounds, consistent with an ice pick or a knife. 35 SR 158-62. Multiple blunt force and sharp force injuries with massive internal injuries were determined to be the cause of death. 35 SR 171-84.

In addition to Davis' confession, the State introduced evidence indicating that Davis had worn shoes found in Davis' home with Barrow's blood on them. 35 SR 100; 37 SR 60-62, 206-207. DNA testing matched the deceased's blood to the blood found on Davis' shoes, which were discovered at Davis' house. 37 SR 77-78, 206-07. Prints from the shoes Davis wore were consistent with shoe impressions found at the scene of the crime, on the victim's clothing, and on the victim's body. 38 SR 134-37, 139-43, 149-55. These prints were likely impressed on the skin of the deceased and over his heart. 38 SR 158-9, 161, 167; 37 SR 40, 60-1, 77-8, 167-8.

Cynthia Green testified that she was living with Davis at the time of the offense. 37 SR 34. Green testified that on the night of the offense, Davis came home late at night nervous and upset, with blood on his face and leg. 37 SR 41-44. The next day Davis brought a TV, VCR, some jewelry, and a tape rewinder into their house, and told Green that he had been with Ray-Ray. 37 SR 42-43. Green pawned the items for Davis; the items were later

identified as belonging to Michael Barrow. 37 SR 52; 33 SR 110-11; 34 SR 19-27. Davis fingerprints were found on some of these items. 35 SR 226-27. Bloody clothing was found in Green and Davis' house which was linked to the murder. 35 SR 100; 37 SR 77-78, 204-207. DNA testing on weight lifting gloves found at Davis' residence demonstrated that the gloves also had the deceased's blood on them. 37 SR 189, 204-05.

Further, Angel Johnson, Raydon Drew's former girlfriend, testified that Raydon told her that he and "Lil Artist killed a boy." 37 SR 171-72, 182-183. The evidence showed that Davis had the nickname "Li'l Artist." 37 SR 35. Davis' ex-wife, Mary Katherine Davis Cornelius, testified that she visited Davis in the county jail and that he told her vague details about the offense. 38 SR 13-14. Cornelius indicated that one of the Drew brothers was trying to earn a teardrop for gang status. *Id.* She also said that Davis told her that he tied Barrow's hands with a bandana. *Id.* She further testified that Davis was a member of the Crips gang and that their gang color is blue. 36 SR 16, 18. Finally, cohort Raydon Drew gave a statement to the police in which he admitted that he and Davis had killed Barrow. 35 SR 83.

## II.     Facts Related to Punishment

### A.     State's evidence

The State presented evidence of Davis' abusive treatment of women. Specifically, Davis' former wife, Mary Cornelius, testified that Davis was mentally and physically abusive during their marriage. 40 SR 19, 21. Davis monitored her every move, and would not allow her to use the phone or leave the house. 40 SR 19-20. On occasion Davis held her at knifepoint; other times he required her to stand before him for great lengths of time, sometimes naked, not allowing her to sit down or to leave the house. 40 SR 20-27, 49. Davis also kicked her and beat her. This abuse occurred even while she was pregnant; Cornelius miscarried after one such beating, during which she was kicked in the stomach. 40 SR 20-23. Cornelius testified that Davis would rub her with alcohol because he thought it would keep her from bruising when he hit her. 40 SR 27. On one occasion, Cornelius

6

...

stole a car for Davis by telling the car dealership she wanted to take it for a test-drive. Davis, who said he needed the car to get out town quickly, took the car and left with the couple's daughter. 40 SR 67. Cornelius was to join Davis, but went into labor a few hours later and went into the hospital, where she was questioned about the stolen car. 40 SR 67. Cornelius, who was still in the hospital, had agreed to take responsibility for the stolen car so that Davis would not get into trouble, until Davis suggested that she abandon the newborn baby in the hospital--stating that they "could have another baby"–and get out of town. 40 SR 67-68, 84. She then attributed the theft to Davis, who later was convicted and went to prison. 40 SR 66, 69-71. Cornelius finally left him when Davis became abusive toward their children. 40 SR 32-33.

Davis' former girlfriend and mother of one of his children, Sherry Morrison, also testified regarding Davis' abusive treatment of her. Morrison met and moved in with Davis when she was fifteen. 40 SR 89-90. Davis became physically and verbally abusive towards her. 40 SR 91-93. Davis would lock her in the house and mark the door so that he would know if she had tried to leave. 40 SR 92. After she became pregnant, Davis kicked her in the stomach, telling her he did not want her to keep the baby. 40 SR 93. When Morrison left him shortly thereafter, Davis refused to return her belongings. 40 SR 93.

Davis had a vast prior criminal record. Davis plead guilty to unauthorized carrying of a weapon, namely a club and an 8 1/4 inch hunting knife, on April 10, 1986, for which he was fined and sentenced to three days in jail. 41 SR 191-93, 199; SX 227-P-231-P. Davis again plead guilty and was sentenced to three years in TDCJ for the offense of possession of a prohibited weapon, but was given a probated sentence on June 26, 1989. 41 SR 174-77, *see* SX 346-P. His probation was revoked in February, 1990, for violating the terms of his probation, and Davis was re-sentenced to two years in TDCJ. 41 SR 175-76; SX 346-P. Davis plead guilty to theft by check on February 6, 1991, and received a probated sentence of five years. 41 SR 178-79. However, his probation was again revoked on March 11, 1992, for not following the terms of his probation and he was sentenced to two years in TDCJ. 41

7

SR 179-82. Davis again plead guilty to theft committed on June 26, 1993, for which he was sentenced to four years in TDCJ. 41 SR 173-74.

After the Barrow murder but prior to his arrest, Davis committed an armed robbery at a children's clothing consignment shop. On September 12, 1995, Davis entered the shop and asked the owner, Teresa Bass, to help him select several items of children's clothing. 42 SR 6-8. While she was writing up the sale, Davis showed Bass a note on which was written, "I have a gun. Please hand over your money, or I'll shoot you. Thank you." 42 SR 8-9. Davis pulled a gun out of his jacket and pointed it at her. 42 SR 9-10. Bass handed Davis approximately $350.00 and put the clothing he had selected in a bag. 42 SR 10-11. Davis ordered her to get on the floor, telling her that if she moved he would shoot her. 42 SR 11. Bass testified that she feared for her life during the robbery, and identified Davis as the man who robbed her. 42 SR 12, 16-17. Fingerprints taken from the note were identified as Davis', and the bag of clothing and money taken during the robbery was recovered at Davis' house at the same time the police recovered the bloody clothing. 42 SR 22-24, 26-28, 31-32.

Most significantly, while awaiting trial for the capital murder of Michael Barrow, Davis was connected to another capital murder, committed in Dallas in July, 1993. Davis' niece, Veronica Davis, testified that she went on a trip to Dallas with Davis in 1993, during which time they ran out of money and were unable to return home. 41 SR 81-83. Davis met a man at a grocery store, later identified as Lexie Harris, who asked them for a ride and who invited Davis up to his apartment for a drink; Veronica stayed in the car. 41 SR 83-84. Davis returned to the car stating that he was going to "get him," referring to Harris. 41 SR 85-87. Davis obtained a paring knife from a store and returned to Harris' apartment, where Veronica once again stayed in the car. 41 SR 85-87. Davis returned to the car some time later, covered in blood, and said that Harris had tried to kiss him, so Davis had stabbed him, beaten him with the toilet tank lid, and taken his wallet. 41 SR 87-89. The evidence from the crime scene indicated that Harris died of blunt force injuries to the head, possibly caused

from being beaten with a ceramic toilet tank lid or towel bar which were found in Harris' living room, and sharp force (or stabbing) injuries. 40 SR 129; 41 SR 16, 39-43. Harris' wallet, containing cash, was missing. 41 SR 18-19, 56-57, 67. Fingerprints were obtained from a beer can in the garbage and were later identified as Davis' prints. 40 SR 148-49; 188-90, 195-95; 41 SR 63-64.[5] Capital murder charges were filed against Davis for the Harris murder; however, Davis was already in jail, awaiting trial for the capital murder of Michael Barrow. 41 SR 64-67. Therefore, Davis has not been tried for Harris' murder.

While in jail awaiting trial, Davis had an altercation with members of the Potter County Sheriff's Department. Deputy Johnny Cox testified that on May 23, 1997, the officer received word that another inmate was in danger and that he would have to be moved to another cell; the officers attempted to switch Davis and this inmate, but Davis refused to be moved. 41 SR 202-07. When the officers attempted to put handcuffs on Davis and forcibly move him, he resisted and struck a female deputy, knocking her to the ground, then struck another officer in the chest. 41 SR 207-08. Davis was holding an uncapped Bic pen (considered a weapon in this context) in his fist in a "stabbing" manner. 41 SR 208-09, 222. Deputy Cox struggled with Davis until another officer knocked them both to the ground, at which time Davis was placed in handcuffs and leg irons. 41 SR 209-11. Officer Cox was struck in the face and received several bumps and bruises on his knees and elbows. 41 SR 212-14. Deputy Gregory Gill received scratches and cuts to his arms during this altercation, and Davis unsuccessfully tried to strike Gill in the face and chest and kick him between the legs. 41 SR 225. A search of Davis' cell revealed several ink pens hidden with his socks; inmates are only allowed to have two pens in their cells. 41 SR 217-18.

Finally, Royce Smithey testified generally regarding classifications of prisoners in TDCJ, and testified regarding the organization of gangs within the prison. 42 SR 56-89.

---

[5]     In 1995, the Dallas Police Department ran the prints from the 1993 unsolved Harris murder as part of a routine investigation into the unsolved homicide. Davis' prints were matched at this time. 40 SR 182-83,188-90, 194-95.



Smithey opined that someone convicted of capital murder, who was a self-admitted gang member and who had behaved in the manner Davis had prior to his arrest, would be "useful" to a prison gang. 42 SR 117-18. Further, because there are opportunities for violence against humanity in any part of the prison, such an individual could choose to inflict violence upon anyone he came in contact with within the prison system. 42 SR 118-19.

### B.   Defense's evidence

In his defense, Davis presented testimony from a fellow inmate's mother who attested to Davis' artistic ability: she provided him with t-shirts and photographs while he was in jail; Davis in turn drew the photographs onto the t-shirts in exchange for money. 43 SR 4-9. Alice Paschal who worked for Prison Jail Ministry, testified that Davis had completed an entire Bible course while in jail, receiving a passing grade for each lesson. 43 SR 14-17. For this, he had received a Bible engraved with his name. 43 SR 17.

Fellow inmate Michael Kemp testified that, while incarcerated with Davis in the Potter County Correctional Facility for two months, he witnessed that Davis read his Bible, kept to himself, and was consumed with his art. 43 SR 24. Kemp and Davis studied together and talked about family. 43 SR 24-25. Kemp testified that he was housed in a segregated cell because of his sexual orientation; however, Davis never treated him differently because of his sexual orientation. 43 SR 25-26. Kemp never observed Davis involved in any altercations. 43 SR 26.

Finally, Dr. Mark Cunningham testified that, in his opinion, the likelihood of Davis committing acts of violence in prison across a capital life prison term was low. Further, the likelihood of Davis committing serious acts of violence if ever paroled in old age was also low. 44 SR 176-77. Finally, in Dr. Cunningham's opinion, Davis suffered from "a number of significant emotional factors — adverse life events and traumatic experiences that disrupted his development, and contributed to his participation in criminal activities, and eventually contributed to his participation in this offense." 44 SR 177.

Cunningham's opinion regarding Davis' potential for future dangerousness was based,



in part, upon his review of Davis' record.  During prior incarcerations, Davis was allowed to work in prison and was not held in lockdown status.  44 SR 184.  Davis only had one infraction while in TDCJ–a non-violent write-up for disobeying an order.  44 SR 185. Further, despite numerous write-ups while in the Potter County Jail, Cunningham believed that the overwhelming majority of Davis' "presentation" in jail had been cooperative and respectful, and he had shown that he was a manageable, predictable inmate. 44 SR 187, 218. Regarding the likelihood of returning to prison or committing a serious act of violence if paroled, such likelihood decreases with age based on recidivism rates.  44 SR 226-33.

Cunningham cited to a number of factors in Davis' development that, in his opinion, were emotionally damaging and contributed to his violent activity, gang affiliation, and participation in this offense.  Specifically, his father was an alcoholic and abused Davis' mother; he was murdered when Davis was nine. 44 SR 234-35. Davis' mother was involved with the man who murdered his father and was possibly having an affair that led to the murder.  44 SR 235-36.  His mother remarried another man who was subsequently arrested in front of Davis and sent to prison for beating his mother.  44 SR 236-38.  His mother's next boyfriend was physically and verbally abusive of Davis; Davis lived in the backyard to escape abuse and was subsequently sent to a children's home, where his mother had little contact. 44 SR 240-45.  Davis was sent to Texas Youth Commission (TYC) until he was sixteen; he did well in the structured environment. 44 SR 245-46.  However, Davis married an older woman at the age of 16 and left TYC; the marriage lasted only a few months, and he was sent back to TYC. 44 SR 246-47. Davis' sister, to whom he was closest, became a drug-dependent prostitute and was brutally murdered in 1993; one brother is a substance abuser; another attempted to molest Davis and is also an accused arsonist; another sister is drug dependent; a brother was convicted of rape and is still in prison on another offense; another sister is an alcoholic; only one sister, Debra, currently has a functional life and stable family pattern. 44 SR 247-49. For these reasons, Cunningham was not surprised that Davis does well in custody: he had no external structure, thus, no internal structure; however, in an

11

institution where an external structure is present, he thrives. 44 SR 254. On cross-examination, Cunningham admitted that Davis understood the nature of his conduct and the rightness and wrongness of his conduct. 44 SR 260-61. Furthermore, Davis is not insane and understands he is criminally responsible for his conduct. 44 SR 261.

### III.   Objections to State's Closing Argument

In rebuttal to Davis' guilt-phase summation, the prosecutor argued the following (along with the objection, the motions, and the ruling):

> [THE PROSECUTOR]: Two of the footprints [shoe sole prints] are on the trousers [of the deceased], and they are consistent with the shoes [prints] that we now know belong to Raydon Drew. And on one of those [the shoe sole examining expert] was able to see particular characteristics, and absolutely said [the shoe sole print] came from that bloody pair of shoes [Davis' shoes] recovered from the attic of Cynthia Green's house [appellant's then girlfriend], led to -- [the police] were led to [his shoes] by [Davis'] confession. There were three footprints with the little wavy pattern coming from these shoes, the shoes of the defendant, Larry Donell Davis. He [the examining expert] can't say they were from these shoes. All he could do was lay a one-on-one on it, and say that it was consistent with regard to two -- and [the examining expert] could not exclude. And then on the third one [the print on the deceased's chest], the one right here, the one right near his [the deceased's] heart, the one that could have ruptured his [the deceased's] heart and busted his sternum, [the examining expert] said there are some consistencies. I cannot exclude them, but I can tell you there's consistencies and inconsistencies. You look at it. You look at it. You decide. There is no magic here. There were two sets of shoes here. Only two sets of prints, with the exception of one set of prints in the kitchen which they couldn't identify to anybody's shoes. You will look at it. And what you will determine is Larry Donell Davis' shoes stepped on that boy [the deceased] three times. Maybe more. There was even one of his prints on the [deceased's] pants. Let me tell you, when this man [Davis] with the teardrop on his eye, who sits here silently --
>
> [DEFENSE COUNSEL]: Your Honor --
>
> [THE PROSECUTOR]: -- and sits there and watches while --



[DEFENSE COUNSEL]:  That is a direct comment on his failure to testify, and we object.

THE COURT:  I will sustain the objection.

[DEFENSE COUNSEL]:  Please instruct the jury to disregard that last comment.

THE COURT:  Ladies and gentlemen, please disregard the last statement.

[DEFENSE COUNSEL]:  Move for a mistrial.

THE COURT:  And the Motion to –

[DEFENSE COUNSEL]:  For mistrial is denied?

THE COURT:  Is denied.

[THE PROSECUTOR]: -- watches while his attorneys get up here, and say [make closing statements]:  What's going on here? [reference to Davis' closing argument].  Has the [S]tate caused you [Davis] to tell you this lie?  No. The physical evidence brings you [Davis] here [in this courtroom].  And let me tell you what [Davis] did. [Davis] instructed [Raydon Drew]. [Davis] provided him [Raydon Drew] with three weapons, according to [Davis'] own mind, and they talked about earning a teardrop just like [Davis] wears on his eye, before [the police] ever got there.  [Davis] provides [Raydon Drew] three weapons, as a party to this crime, and then he stoops down and [Davis] bursts the heart of this boy.  That's what the physical evidence shows you.

39 SR 50-52.

## IV.   Disposition of Claim in State Court

### A.   Hearing on motion for new trial

After the completion of the trial, Davis filed a motion for a new trial, arguing, in part, that "[t]he trial court committed material, reversible error which injured and prejudiced [Davis'] substantial rights when it failed to grant [Davis'] motion for mistrial based on the prosecutor's direct, unequivocal comment made during the State's final argument at guilt/innocence on [Davis'] failure to testify."  2 Tr 408, ¶ 2.  The trial court held a hearing

13

on Davis' motion on May 6, 1999, during which both the defense and the State presented witnesses.

The defense called Deborah Evatt, a friend of defense attorney Bonita Gunden who was present in the courtroom during the guilt/innocence phase closing argument. 46 SR 21-23. Evatt testified that, during closing argument, prosecutor Pat Murphy was speaking very loudly--practically yelling, was holding what appeared to be Davis' confession in his hand, which he set down in a very "hard" fashion, then abruptly turned and walked over to Davis, pointed his finger at him and said that Davis "sat there silently — and his attorneys were defending him he just — he never said anything to help himself." 46 SR 24-26. Deborah Darnell, who was also a friend of Gunden and present for closing argument, testified for the defense that Murphy "slammed [Davis'] confession down on the jury box[,] ... swung around[,] ... took a lunging step forward, and pointed directly at [Davis], saying how he was sitting silently .. [a]nd hiding behind his lawyers." 46 SR 38-41. Darnell described Murphy as "irate," his voice was "strong," he was almost shouting, and his face was red. 46 SR 41-42. Finally, the defense called attorney Jesse Quackenbush, who was also present in the courtroom during closing arguments. Quackenbush testified that he witnessed Murphy "fumbl[e] around" before the jury with Davis' confession, then Murphy "reeled around, and he pointed at [Davis], and said something to the effect that he was hiding behind his attorneys, sitting there silently." 46 SR 58-59. Regarding the defense's objection to Murphy's comment, Quackenbush opined that the trial judge "did a good job in responding to the objection, in that he immediately ... said sustained. And there was no hesitation in his voice whatsoever." 46 SR 65.

In response, the State called jury foreman Frederick Gibbs. Gibbs recalled an incident where argument was made about Davis' failure to testify, but could not remember exactly what was said. 46 SR 80. Gibbs did recall that the trial judge instructed the jury to disregard what was said. 46 SR 80-81. Gibbs testified, over objections, that he followed the court's instructions to disregard the statement and there were no violation of the court's jury

14

instructions during deliberations. 46 SR 86-87.

On June 11, 1999, the trial court denied Davis' motion for a new trial. 2 Tr 483.

**B.      Disposition by state court on direct appeal**

Davis raised this claim on direct appeal. The Court of Criminal Appeals found that the prosecutor made an improper comment on Davis' failure to testify and that the comment, in conjunction with the prosecutor's physical actions, was "naturally and necessarily taken as such." *Davis,* No. 73,458, slip op. at 4. Furthermore, the court assumed *arguendo* that the trial court's instruction to disregard did not cure the improper comment. *Id.* at 5. However, the court also found that the prosecutor's comment amounted to harmless error because none of the criteria as set forth in *Anderson v. Nelson,* 390 U.S. 523, 524 (1968),[6] were met. *Id.* Specifically, the comment on Davis' failure to testify "entailed a single comment, the emphasis of the State's argument was the evidence, and there was no evidence that supported acquittal." *Id.*[7]

**C.      Disposition by state court on state habeas review**

Davis raised this claim again as his sole claim on state habeas review and made a cursory request for an evidentiary hearing. The Court of Criminal Appeals once again denied relief, adopting the findings of the trial court. The trial court concluded that the reporter's

---

[6]     *Anderson* holds that a comment on a defendant's failure to testify is not harmless if (1) the comment was extensive, (2) an inference of guilt is stressed as the basis of the conviction, and (3) evidence could have supported acquittal. *Anderson,* 390 U.S. at 524; *see also Davis,* slip op. at 5.

[7]     Regarding the testimony of jury foreman Gibbs, the state court acknowledged, in a footnote, Davis' contention that the trial court violated Texas Rule of Evidence 606(b) by permitting Gibbs to testify at the motion for rehearing. However, the court declined to address this claim because it was "multifarious and inadequately briefed." *Davis,* No. 73,458, slip op. at 2 n.1. In the present petition, Davis once again makes only a cursory statement that Gibbs' testimony was "prohibited by Rule 606, *Texas Rules of Evidence,*" without including argument or caselaw. Petition at 15-16. Therefore, this claim should be deemed waived in these proceedings for failure to adequately brief. *See Trevino v. Johnson,* 168 F.3d 173, 181, n.3 (5th Cir. 1999); *Pyles v. Johnson,* 136 F.3d 986, 996, n.9 (5th Cir. 1998); *Cinel v. Connick,* 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim").

15

record in this case was "amply sufficient" for the court to make a determination about whether the challenged argument violated Davis' rights and whether such argument was harmless under the circumstances. SHTr 137, #15; 138-39, #5 and 6; 142, #16; 144, #5 and 6; *see also* SHTr 137-38, ##16-22; 142-43, ## 17-23. Therefore, the court determined that it need not "resort to further extraneous evidence outside the reporter's record to determine if the challenged jury summation is erroneous, and, if there is error, whether the error is harmless." SHTr 144, #6.

The court concluded that "[t]he Court of Criminal Appeals has already overruled [Davis'] contention that the prosecutor's closing summation constituted reversible error in the underlying appeal and thereby determined the same issue raised in [Davis'] habeas corpus contention." SHTr 139, #9; 145, #10. Therefore, because the claim had been raised and rejected by the Court of Criminal Appeals on direct appeal, the claim was not cognizable in the state habeas proceeding, and "there are no unresolved factual issues material to the legality of [Davis'] confinement." SHTr 139, #10; 145 #12-14.

## MOTION FOR SUMMARY JUDGMENT

Davis, confined pursuant to a state court judgment, is entitled to federal habeas relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). This petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA)[8] and, thus, must be reviewed under the amended habeas provisions effected by the Act. *Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997).

An application for writ of habeas corpus shall not be granted with respect to a claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim:

---

[8]      In *Lindh v. Murphy*, the Supreme Court held that the AEDPA applies only to cases filed after the statute's enactment on April 24, 1996. 521 U.S. 320, 335 (1997). Davis filed this petition on July 31, 2003, therefore the amended provisions apply to him.

16

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The amended § 2254(d) establishes standards that foreclose relief based on each of the three different questions on which a state judicial decision may rest on the merits, *i.e.*, questions of fact, questions of law, and mixed questions of law and fact. *See Terry Williams v. Taylor,* 529 U.S. 362, 405-06 (2000); *Dowthitt v. Johnson,* 230 F.3d 733, 740-41 (5th Cir. 2000). With regard to questions of law, the Supreme Court has held that a state court decision is "contrary" to established federal law if the state court arrives at a conclusion "diametrically" opposed to that reached by the Supreme Court.[9] *Williams,* 529 U.S. at 405. Similarly, when confronting a mixed question of law and fact, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407. A federal habeas court's inquiry into reasonableness should be objective rather than subjective. *Id.* at 409-10. Accordingly, this Court cannot grant relief on claims unless it determines the state court's adjudication was "diametrically opposed" to, or involved an objectively unreasonable application of, compelling Supreme Court precedent that existed at the time the conviction became final. 28 U.S.C. § 2254 (d)(1); *Williams,* 529 U.S. at 412-13. Furthermore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly[,]" the court must also conclude that the application was objectively unreasonable. *Williams,* 529 U.S. at 411.

---

[9]     A state court decision that confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result, is also "contrary" under the meaning of § 2254 (d)(1). *Williams,* 529 U.S. at 405

With regard to questions of fact, § 2254 (e)(1) requires federal courts to presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254 (e)(1). Further, except for the narrow exceptions contained in § 2254 (e)(2), the evidence upon which an applicant would challenge a state court fact finding must have been presented to the state court. Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence *presented in the state court proceedings,"* 28 U.S.C. § 2254 (d)(2) (emphasis added), it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.

In addition, the AEDPA did not purport to subsume prior precedent which forecloses habeas relief if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## I.    Any Alleged Error In the State's Closing Argument Was Harmless.

In his sole claim for relief, Davis asserts that the State's comment, during the guilt/innocence phase closing arguments, on Davis' silence amounted to "a verbal and physical attack on [Davis'] right to remain silent," and argues that it cannot be determined beyond a reasonable doubt that such comment did not contribute to the guilty verdict or subsequent death sentence. Petition at 17. However, Davis fails to demonstrate that the state court's resolution of this claim was contrary to or an unreasonable application of clearly established federal law. The state court correctly concluded that the single comment by the prosecution during closing argument was harmless in light of the overwhelming evidence in

18

support of the jury's verdict. Therefore, deference should be applied to the state court findings, and relief on this claim should be denied.

The Fifth Amendment guarantees the criminal defendant an unqualified right to choose whether or not to testify at trial. *Harris v. New York*, 401 U.S. 222, 225 (1971). When a defendant chooses not to testify, the Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609 (1965). Indirect commentary on a defendant's silence is not considered a violation of the Fifth Amendment unless the prosecutor manifestly intended the statement to be a comment on the defendant's refusal to testify or unless the jury would naturally and necessarily interpret the statement as such a comment. *United States v. Smith*, 890 F.2d 711, 717 (5th Cir. 1989). Moreover, the comments complained of must be viewed within the context of the trial in which they are made. *United States v. Bright*, 630 F.2d 804, 826 (5th Cir. 1980). Further, even if a prosecutor's statement is found to be a comment on the defendant's failure to testify, such comment may be excused under the "invited reply" doctrine if the prosecutor's remarks were an appropriate response to statements or arguments made by the defense. *United States v. Robinson*, 485 U.S. 25, 31 (1988).

Regardless, an improper argument is not a "structural" error. The Supreme Court has determined that an improper comment on a defendant's silence at trial, in violation of his Fifth Amendment right against self-incrimination, is subject to a harm analysis. *United States v. Hasting*, 461 U.S. 499, 509 (1983). In this regard, according to *Chapman v. California*, a constitutional error does not automatically require reversal of a conviction. 386 U.S. 18, 22 (1966). Rather, the Supreme Court determined that a trial judge's improper comment on a defendant's failure to testify was not a proper basis for reversal if harmless. *Chapman*, 386 U.S. at 21-24. Since *Chapman v. California*, the Supreme Court has made clear that reviewing courts have a duty to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations. *Hasting*, 461 U.S. at 509.

In examining the effect of a prosecutor's impermissible comments, the Fifth Circuit

19

Court of Appeals has considered three factors: (1) "the magnitude of the prejudicial effect of the remark," (2) "the efficacy of any cautionary instruction," and (3) "the strength of the evidence of a defendant's guilt." *United States v. Johnston*, 127 F.3d 380, 398 (5th Cir. 1997); *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir.1994). Strong evidence of guilt can render comment on a defendant's refusal to testify harmless. *United States v. Valley*, 928 F.2d 130, 135 (5th Cir. 1991); *see United States v. Runyan*, 290 F.3d 223, 250 (5th Cir. 2002) (finding strong evidence of guilt rendered admission of evidence of refusal to consent to warrantless search harmless); *see also Montoya v. Collins*, 955 F.2d 279, 287 (5th Cir. 1992) (An "isolated comment in a sea of [incriminating] evidence" is harmless); *Cotton v. Cockrell*, No. 02-21263, 2003 WL 21990268, *4 (5th Cir. 2003) (same). The Fifth Circuit has held that overwhelming evidence of guilt in addition to a curative instruction renders harmless an impermissible comment by the prosecutor. *Cotton*, 2003 WL 21990268, *5; *Netherly v. Collins*, 993 F.2d 1154, 1159 (5th Cir. 1993). When viewed in the context of the entire trial, the challenged argument was an isolated comment which the jury was immediately instructed to disregard. It is clear, in light of the record, that the challenged comment did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776).[10] Therefore, for the reasons stated below, no harm resulted in this case.

Clearly the "magnitude" of the remark was not so great as to be the focus of the prosecutor's case or to undercut Davis' defense. The objectionable comment came in rebuttal after the defense had argued that the evidence did not support Davis' conviction for capital murder and that his confession was unsupported and inconsistent with the others and should not be believed. 39 SR 26-41. Nevertheless, after sustaining Davis' objection to the

---

[10]    While Davis and the state court refer to the more-onerous *Chapman* "beyond a reasonable doubt" standard, *see* SHTr 145 #13; Petition at 17, on federal habeas review, the Court need only determine whether the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

complained of argument, the trial court promptly instructed the jury to disregard it. 39 SR 50-52. The prosecutor then continued his argument, explaining what he really meant by the statement, *i.e.* that the physical evidence established guilt, not merely Davis' confession, and that the State had not forced Davis to lie in his confession. In the context of the entire trial, the prosecutor's single rebuttal comment was not so egregious that the jurors could not remove the remark from their minds. This is especially true given the fact that (1) the State made no further attempt to circumvent the trial court's ruling; (2) the jury was given oral and written instructions that it could not consider the fact that Davis failed to testify against him in any way; and (3) the jury was *not* asked to convict Davis because he remained silent and did not testify.

The cautionary instructions given to the jury, both before and after the comment in question, were more than sufficient to focus the jury's attention on the proper evidence for consideration. Specifically, in regard to Davis' right to remain silent, the jury was given the following relevant written instructions at the guilt/innocence phase of trial.

> Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and, in the event he elects not to testify, that fact cannot be taken as a circumstance against him. **In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.**

2 Tr 303 (emphasis added). This same instruction was read to the jury before any closing arguments. 39 SR 17. Thus, before the challenged State's summation, the jury was instructed twice by the trial court not to consider the fact that Davis did not take the stand to testify. 2 Tr 303; 39 SR 17.[11] Further, each juror who actually served on the jury was individually given detailed voir dire instructions on Davis' right not to testify by the State.

---

[11] The same charge also provided that "[t]he only function of the jury under this charge is to determine the guilt, if any, of Davis or the innocence of Davis according to the directions and instructions contained herein." 39 SR 15.

The individual members understood the law and agreed to abide by this rule of law which, in this case, included express instructions to disregard Davis' failure to testify. 5 SR 108-111; 6 SR 77-8; 8 SR 8 145-6; 11 SR 263-64; 13 SR 89-91; 15 SR 73-6; 7; 22 SR 196-7; 22 SR 196-7; 30 SR 66; 30 SR 6; 30 SR 137-38; 31 SR 57-8.[12]

In addition, the jury was instructed immediately after the comment was made to disregard the last statement on Davis' failure to testify. 39 SR 51-52.[13] The jury foreperson testified in a hearing on Davis' motion for a new trial that the jury followed the trial court's instruction to disregard, the jury did not consider the challenged argument, and the jury only discussed the evidence presented during the trial. 46 SR 80-1, 86. The foreperson noted that he did not report any violations of court's instructions to the judge. 46 SR 85-7. Clearly the curative instruction was sufficient to guide the jury's decision-making process.

Moreover, the evidence of guilt is overwhelming and includes Davis' 14-page typewritten confession, an oral confession to civilian Cynthia Green, and an admission of guilt to civilian Mary Cornelius. The record shows Davis was known to have worn the bloody shoes found in his home, and DNA testing matched the deceased's blood to the blood found on Davis' shoes; the DNA profile that was consistent with Barrow is found in only one person in 5.7 billion people of the world's population. 37 SR 207-209. Davis' shoes soles had unique characteristics establishing that those shoe prints were found at the murder scene, and were likely impressed on the clothing and skin of the deceased and over his heart. The DNA testing also showed that weight lifting gloves found at Davis' residence had the deceased's blood on them. Additionally, Davis' girlfriend pawned property belonging to the victim which she claims Davis gave to her shortly after the murder, and on which the police

---

[12]     The listed jurors include the twelve jurors that voted in the guilt and punishment deliberations. One juror, who was in the original twelve jurors, was released before the guilty verdict due to sickness. Both parties agreed to her release. 36 SR 83-4.

[13]     In fact, defense witness Quackenbush acknowledged that the trial judge "did a good job in responding to the objection, in that he immediately ... said sustained. And there was no hesitation in his voice whatsoever." 46 SR 65.

found Davis' fingerprints.

Davis' counsel was forced to admit during closing argument that the evidence was adequate to find Davis guilty of murder and/or aggravated robbery. 39 SR 33. Capital murder under this indictment was intentional murder plus robbery. 39 SR 53. The prosecution's challenged argument did not cut any critical defense. The jury was instructed on three lesser included offenses in the guilt charge and the State did not ask the jury to convict Davis because he did not testify.

Regarding Davis' contention that this comment affected the jury's deliberation during the punishment phase of trial, *see* Petition at 17 and 21, Davis has never raised this contention in the state court, therefore any argument regarding the effect of the prosecution's comment in the punishment phase is unexhausted and procedurally barred from consideration on federal habeas review.[14] In any event, the prosecution made no improper comment during

---

[14]     This portion of his argument regarding the punishment phase was not presented to the state court during any proceeding and is, therefore, unexhausted and procedurally barred. "To have exhausted his state remedies, a habeas petitioner must have fairly presented the substance of his claims to the state courts." *Rodriguez v. McKaskle,* 724 F.2d 463, 466 (5th Cir. 1984) (citing *Vela v. Estelle,* 708 F.2d 954, 958 (5th Cir. 1983)). Normally, the exhaustion requirement is not satisfied if the claim is based on a new legal theory or a new factual claim. *Id.* "The state courts must have had an opportunity to pass on the claim in light of a full record and where the factual basis for a claim was not presented to the state courts the claim is unexhausted." *Brown v. Estelle,* 701 F.2d 494, 495 (5th Cir. 1983); *see also Graham v. Johnson,* 94 F.3d 958, 968-69 (5th Cir. 1996). "[The Fifth Circuit] has consistently held that a federal habeas petitioner has failed to exhaust his state remedies when he relies on a different legal theory than he did in state court or when he makes the same legal claim to a federal court but supports the claim with factual allegations that he did not make to the state courts." *Dispensa v. Lynaugh,* 847 F.2d 211, 217 (5th Cir. 1988) (internal citations omitted); *Whitehead v. Johnson,* 157 F.3d 384, 387 (5th Cir. 1998). By adding arguments regarding the effect of the State's comment on the punishment phase, Davis does not set forth a claim in his federal petition which is the "substantial equivalent" of a claim presented in state court. *See Whitehead,* 157 F.3d at 387.

Where Article 11.071 § 5(a) of the Texas Code of Criminal Procedure would apply to foreclose review of the claims presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. *Nobles v. Johnson,* 127 F.3d 409, 422 (5th Cir. 1997); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir. 1998); *Little v. Johnson,* 162 F.3d 855, 859 (5th Cir. 1998); *Hicks v. Johnson,* 186 F.3d 634, 637-38 (5th Cir. 1999); *Beazley v. Johnson,* 242 F.3d 248, 264 (5th Cir. 2001). To avoid the procedural bar, Davis must assert cause

this phase of trial. Therefore, it is unlikely that a comment from the guilt/innocence phase had any prejudicial effect on, or undercut the defense's case during, this stage of the trial, especially since the jury was instructed once again not to consider Davis' silence when deliberating on the answers to the special issues. *See* 2 Tr 316-17.[15] Regardless, the evidence supporting the sentence of death was overwhelming, and included evidence that Davis committed another brutal capital murder two years prior to this one; Davis was affiliated with a violent gang; Davis had been abusive to his wife, girlfriend, and children; Davis had an extensive criminal record followed by an inability to adhere to the requirements of his parole; and finally, David had committed infractions of jail policy while awaiting trial for the present crime. Based upon this magnitude of evidence supporting a jury finding that Davis would present a future danger to society, clearly the cursory comment by the State

---

and prejudice for failing to bring the unexhausted claim in the first state habeas application. *Jones v. Johnson,* 171 F.3d 270, 277 (5th Cir. 1999) (citing *Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992)); *Coleman v. Thompson,* 501 U.S. 722 (1991).

Davis makes no attempt to assert cause or prejudice for failing to raise this claim, as it now appears, in the state court, and clearly none exists. The evidence he relies upon is the same evidence used in support of his claims regarding the guilt/innocence phase. Clearly this argument was available, discoverable, and known to Davis at the time he filed his claims in state court. Therefore, no cause exists to avoid the procedural default.

[15]     The jury was instructed during punishment that:

24.

Our law provides that a defendant may testify in his own behalf if he elects to do so. This, however, is a privilege accorded a defendant, and, in the event he elects not to testify, that fact cannot be taken as a circumstance against him. In this case, the defendant has elected not to testify, and you are instructed that you cannot and must not refer or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against the defendant.

\*\*\*

27.

In this case, during this phase of trial, the defendant has elected not to testify, and you are instructed that you cannot and must not consider, discuss, allude to, comment upon or refer to that fact throughout your deliberations or take it into consideration for any purpose whatsoever against him.

2 Tr 316-17.

24



during the guilt/innocence phase of trial was harmless beyond a reasonable doubt during the punishment phase. Therefore, deference should be accorded to the state court's conclusions, and relief on this claim should be denied.

**II.   Davis Is Not Entitled To An Evidentiary Hearing.**

Davis makes a cursory request for an evidentiary hearing, "should the Court require further evidence that may not appear in the record." Petition at 21. However, this is not a proper request for an evidentiary hearing. Furthermore, a hearing is not necessary for the development of this claim, and Davis has failed to demonstrate his entitlement to one.

An evidentiary hearing in the district court may be necessary only if there exists a "genuine and material" fact issue, and only if Davis also satisfies the AEDPA standards for an evidentiary hearing under 28 U.S.C. § 2254(e). *See also Michael Wayne Williams v. Taylor,* 529 U.S. 420, 429-30 (2000); *McDonald v. Johnson,* 139 F.3d 1056, 1059 (5th Cir. 1998). The amended habeas provisions in § 2254(e)(2) restrict the circumstances under which a federal habeas court is authorized to conduct a hearing to review a state court decision. This statute explicitly forecloses an evidentiary hearing in federal habeas court if the applicant has failed to develop the factual basis of a claim in state court proceedings, unless the applicant shows that:

(A)   the claim relies on –

　　(i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or.

　　(ii)   a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*See Riddle v. Cockrell,* 288 F.3d 713, 719 (5th Cir. 2002), *cert. denied,* 123 S. Ct. 420 (2002); *Hernandez v. Johnson*, 108 F.3d 554, 558 (5th Cir. 1997). Davis fails to even allege that any exception would apply. He does not assert any new rule of law, nor does he allege that he is actually innocent of the crime. With regard to an undiscoverable factual predicate, Davis makes no allegation that he was prevented from fully developing this claim in state court, or that more evidence could be attained through further development. The trial court held a hearing following Davis' motion for a new trial during which the factual predicate of this claim was fully and fairly developed. The state habeas court entered findings that the record was "amply sufficient" for the court to make a determination on this claim, and there was no need to resort to evidence outside the record. SHTr 137, #15; 138-39, #5 and 6; 142, #16; 144, #5 and 6; *see also* SHTr 137-38, ##16-22; 142-43, ## 17-23. Davis does not dispute that this claim was fully developed, nor does he allege what more could have been uncovered. Therefore, he has failed to satisfy the requirements of the AEDPA.

Even if Davis could circumvent the requirements of § 2254(e)(2), he is still not necessarily entitled to a hearing. "[Section] 2254(e)(2) specifies the situations where evidentiary hearings are allowed, not where they are required. Thus, if a petitioner seeking a hearing clears this initial hurdle, he must still persuade the district court." *McDonald v. Johnson*, 139 F.3d at 1059-60; *see Clark v. Johnson,* 227 F.3d 273, 284 (5th Cir. 2000) (petitioner must show a significant factual dispute which could be addressed by a hearing). This Court should deny Davis' request because he has raised nothing in federal proceedings which would entitle him to an evidentiary hearing. Under the law of this circuit, a habeas corpus petitioner is entitled to an evidentiary hearing only where "a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing." *Ward v. Whitley*, 21 F.3d 1355, 1367 (1994); *see also Townsend v. Sain*, 372 U.S. 293, 312 (1963) (holding that federal court does not even have power to conduct evidentiary hearing unless applicant alleges facts which, if proved, would entitle him to relief).

As set forth above, Davis raises no factual dispute which, if resolved in his favor, would entitle him to relief.  Regardless of whether the prosecutor's comments during the guilt/innocence phase closing arguments were inappropriate, such error was harmless in light of the overwhelming evidence of Davis' guilt and evidence in support of a sentence of death.  The facts of this claim have been sufficiently developed in state court, and there is no need for further factual development.  Therefore, this court should also deny is request for an evidentiary hearing.

## CONCLUSION

For all of the foregoing reasons, the Director respectfully asks that Davis' petition for writ of habeas corpus be denied, and that no certificate of appealability issue with regard to the claim raised in the instant federal habeas petition.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

JAY KIMBROUGH
Deputy Attorney General
for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division


TOMEE M. C. CROCKER
Assistant Attorney General
State Bar No. 24007052

P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1600
Fax No. (512) 936-1280

ATTORNEYS FOR
RESPONDENT-APPELLEE

## CERTIFICATE OF SERVICE

I, Tomee M. C. Crocker, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing Respondent Dretke's Answer With Brief in Support has been served by placing same in the United States Mail, postage prepaid, on this the 15th day of October, 2003, addressed to counsel for the Petitioner:

L. VAN WILLIAMSON
1017 W. 10th Avenue
Amarillo, TX 79101

TOMEE M. C. CROCKER
Assistant Attorney General

28