**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION**

_____

| | | |
|---|---|---|
| LARRY DONNELL DAVIS, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:03-CV-001 |
| | § | ** Capital Litigant ** |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner LARRY DONNELL DAVIS, an inmate in the custody of the Texas

Department of Criminal Justice, Correctional Institutions Division, was sentenced to death for

the capital murder of Michael Jerome Barrow.  Petitioner filed a petition for writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  Petitioner claims that his conviction was obtained in

violation of his Fifth Amendment rights because the State commented on his decision not to

testify during the guilt/innocence phase of the trial.  The Court concludes, for the reasons cited

below, that the petition should be DENIED.

## I.

## FACTUAL BACKGROUND

On August 28, 1995, Michael Barrow was found dead by his parents inside his house in

Amarillo, Texas.  Barrow's body had been severely mutilated.  He had suffered significant blunt

force trauma to his face and head, as well as puncture and laceration wounds on his head, neck and chest.  Barrow's blood had been spilled throughout the bathroom, closet and hallway - in some places splattered on the ceiling.  Further investigation showed that several items were missing from the house, including: clothing, a pair of tennis shoes, a tv, a vcr, jewelry, a tape recorder, a pawn ticket and Barrow's bank card.

An autopsy was performed by a medical examiner at the Potter County forensic science center in Amarillo.  The autopsy showed that while Barrow was still alive, his sternum had been broken, and his heart wall had been ruptured.  This rupture was likely caused by a stomp or kick to the chest.  Multiple bloody footprints were found on Barrow's upper torso and chest.  The autopsy also revealed that while all of the wounds suffered by Barrow – the blunt force trauma, stab wounds, and ruptured heart wall – would individually have proven to be fatal, the ruptured heart wall was likely the fatal injury that occurred last.

### *Petitioner's Confession*

Petitioner Larry Donnell Davis was arrested and charged with committing murder in the course of committing and attempting to commit the offense of robbery, a capital offense under Texas Penal Code Section 19.03(a)(2).  Introduced at trial was a fourteen-page confession signed by the Petitioner himself, obtained the day of his arrest.  In his confession, Petitioner explained that he went to Barrow's house the night of the murder as part of a gang plot to murder Barrow and steal his belongings.

Petitioner's account stated that he was originally approached by brothers Raydon ("Ray-Ray") and Donald ("Drew") Drew.  Ray-Ray and Drew were both in need of money, and Ray-

Ray sought to earn a "teardrop" tattoo as a member of the Crips street gang.[1]  According to that account, they decided that they  they would kill Barrow, who was an acquaintance of theirs.  The two solicited Petitioner's help, telling him that he could keep a stereo belonging to Barrow and some chrome wheels from Barrow's car in exchange for his assistance.

According to Petitioner's confession, the death of Michael Barrow occurred in the following manner.  On the night of the murder, the Petitioner said that he, Ray-Ray, and Drew went with two lookouts to Barrow's house.  Once inside the house they visited with the victim, then Ray-Ray hit him over the head with a set of weights.  Barrow was then tied by his hands and feet and moved toward the bathroom   At that point Drew ran out of the house and departed, leaving Petitioner and Ray-Ray.  Ray-Ray then started repeatedly stabbing Barrow with a knife.  When the knife handle broke, Ray-Ray continued his attack wielding the blade alone, and then with an assortment of other weapons, including an icepick, butcher knife and lead pipe.  After this assault, when Barrow still hadn't died, Ray-Ray stood on his neck and kicked him in the chest until he finally expired.

Petitioner stated that it was Ray-Ray alone who inflicted the fatal injuries on Barrow.  However, he admitted to giving aid to Ray-Ray.  He admitted to lulling Barrow into a false sense of security by telling him on numerous occasions that no one was going to hurt him.  He stated that he tied Barrow's hands with a handkerchief, held him down while Ray-Ray attacked him, moved him toward the bathroom, and handed Ray-Ray each of the weapons he eventually used to kill Barrow.  He admitted to giving Ray-Ray advice and instructions on how the killing should

---

[1]According to Officer Steve Powers' testimony, and Petitioner's ex-wife, Katherine Davis, the teardrop tattoo is a gang symbol that may suggest the bearer has murdered another person.  According to Officer Powers, one can "earn" a teardrop by killing another person.

be accomplished.  He admitted cajoling the reluctant Ray-Ray into completing the killing,

saying, "Are you going to do it or not?" "You are talking that you want your teardrop." "You

already hit him, he know's y'all."

Petitioner also admitted in his confession that after the killing he took numerous items

from Barrow's house and pawned some of them.  He and Ray-Ray took Barrow's pulse card,

video cassette recorder, television, Nike tennis shoes and a bag of clothes.  He bought the shoes

from Ray-Ray, and hid them in his girlfriend's house, along with the clothes he had taken from

Barrow's.  He asked his girlfriend to pawn some of the other items.

### *The Parties' Arguments at Trial*

The Defense's overall trial strategy centered on minimizing Petitioner's level of

involvement in Barrow's death, to persuade the jury to convict him of some lower crime than

capital murder.  "It is proper to convict this young man of murder.  It is proper to convict him on

aggravated robbery.  The evidence supports it.  But to convict this man on a theory of capital

murder . . . . You know what?  They can't."  The Defense claimed that, if the confession were

taken at face value,  he was only a passive participant in the killing, and that he was only

recruited by the others to commit theft.  They also highlighted inconsistencies between the

statement and the actual physical evidence, including the location of the killing; they contended

that this evidence showed that he might not even have been present when the crime was

committed.

The Prosecution, on the other hand, described the Petitioner as the ringleader of the

crime, directing, instructing, and coaxing the other participants as well as inflicting injury on

Barrow himself.  The Prosecution demonstrated that the injuries of Barrow and the bloodstains at the scene of the crime matched Petitioner's description of the weapons used and the manner in which the killing was done.  They also demonstrated that Petitioner's description of his disposition of Barrow's stolen property matched the locations where all of the property was found.  Petitioner's bloody shoes and clothes, as well as weights and weightlifting gloves, were found in the attic of his girlfriend, Cynthia Green.  Michael Barrow's DNA was left on the bloody shoes the police had found.  The jewelry, television, VCR and tape rewinder had been pawned by Green, who said that she had pawned the items at Petitioner's instruction.  Barrow's bank card was found in Petitioner's wallet, along with another pawn ticket belonging to Barrow.

The Prosecution further argued that the written confession Petitioner gave was consistent with the testimony of other witnesses who were familiar with Petitioner and knew details of the crime.  Cynthia Green testified that on the night of the murder, she saw Petitioner with scratches on his face, arms, and legs, as well as a bruise on his forehead.  He told her that the items Petitioner had taken and that Green later pawned belonged to Ray-Ray, and that Petitioner and Ray-Ray had taken them back from someone who didn't want to give them away.

Petitioner's ex-wife, Katherine Davis also testified, and said that the Petitioner confessed to her when she went to visit him in jail shortly after he was arrested.  She testified that Petitioner told her that he had been in Barrow's home with the two brothers, one of whom wanted to earn a teardrop tattoo; that while they were lifting weights, Barrow had been hit on the head with the weight; and also that he had cajoled the brother into finishing the killing because he was having a hard time "doing what he needed to do" to earn his teardrop.  Petitioner admitted to Davis that he had tied Barrow's hands with a blue bandanna.  He told Davis that the

other brother would not stay and watch, and said that he had hidden the weapon in a safe place.

The attorneys for the Prosecution went further, arguing that the physical and testimonial evidence showed that Petitioner was an even more active participant than his confession suggested. The Prosecution surmised from this evidence that it was actually Petitioner who killed Barrow. The Prosecution showed photos of a shoe-print matching the shoes worn by the Petitioner on Barrow's chest - in the spot where Barrow's sternum was broken - and concluded that it was Petitioner who actually inflicted the final fatal injury to Barrow. They also introduced the confession of Ray-Ray, Petitioner's co-defendant, who claimed that it was not he, but Petitioner, who inflicted all of the fatal wounds on the victim. Finally, they noted that the Petitioner appeared in court with a teardrop tattoo on his face, arguing that Petitioner may have added the tattoo to take credit for Barrow's murder.

The Prosecution specifically argued to the jury that they could convict the Petitioner of capital murder either by determining him to be a party to a felony murder, or as an active participant in the killing itself. The Prosecution argued that the jury could believe the confession, or believe that Petitioner himself struck the final lethal blow to Barrow's chest that ruptured his heart, and be justified in finding him guilty of capital murder.

### *Prosecutor's Alleged Misconduct*

At the end of the state's closing, Assistant District Attorney Patrick Murphy made the statement that is now challenged by Petitioner in this habeas action. In addressing the defense's attempt to impeach the confession of the Petitioner himself, the following colloquy occurred:

> Mr. Murphy:   - [Petitioner] told you the truth in all except one respect. And
> that's the depth of his involvement as a primary actor. There are

footprints on the body and the trousers of this victim laying at the scene.  Two of the footprints are on the trousers, and they are consistent with the shoes that we now know belong to Raydon Drew.  And one of those [the footprint expert] was able to see particular characteristics, and absolutely said it came from that bloody pair of shoes recovered from the attic of Cynthia Green's house led to - we were led to by his confession.  There were three footprints with the little wavy pattern coming from these shoes.  All he could do was lay a one-on-one on it, and say that it was consistent with regard to two- and he could not exclude.  And then the third one, the one right here, the one right near his heart, the one that could have ruptured his heart and busted his sternum, he said there are some consistencies.  I cannot exclude them, but I can tell you there's consistencies and inconsistencies.  You look at it, You look at it.  You decide.  There is no magic here.  There are two sets of shoes here.  Only two sets of prints, with the exception of one set of prints in the kitchen which they couldn't identify to anybody's shoes.  You will look at it.  And what you will determine is Larry Donnell Davis' shoes stepped on that boy three times.  Maybe more.  There was even more of his prints on the pants.  Let me tell you, when this man with the teardrop on his eye, *who sits here silently* --

Mr. Clark :       Your Honor --

Mr. Murphy:     --and sits here and watches while –

Mr. Clark:        That is a direct comment on his failure to testify, and we object.

The Court:       I will sustain the objection.

Mr. Clark:        Please instruct the jury to disregard that last comment.

The Court:       Ladies and gentlemen, please disregard that last comment.

Mr. Clark:        Move for a mistrial.

The Court:       And the Motion to –

Mr. Clark:        For mistrial is denied?

The Court:        Is denied.

Mr. Murphy:     – watches while his attorneys get up here, and say: What's going

> on here? Has the state caused you to tell you this lie? No.  The
> physical evidence brings you here.  And let me tell you what he
> did.  He instructed him.  He provided him with three weapons,
> according to his own mind, and they talked about earning a
> teardrop just like he wears on his eye, before they ever got here.
> He provides him three weapons, as a party to this crime, and then
> he stoops down and he bursts the heart of this boy."

In addition to the instruction given when the comment was made, the jurors were given

written and oral instructions in the Court's charge that contained the following instruction:

> Our law provides that a defendant may testify in his own
> behalf if he elects to do so.  This, however, is a privilege
> accorded a defendant, and, in the event he elects not to
> testify, that fact cannot be taken as a circumstance against
> him.  In this case, the defendant has elected not to testify,
> and you are instructed that you cannot and you must not
> refer to or allude to that fact throughout your deliberations,
> or take into consideration for any purpose whatsoever as a
> circumstance against the defendant.

A hearing on a motion for new trial was held on May 6, 1999.  The Petitioner introduced

testimony of persons present at the trial.  Deborah Darnell and Deborah Evatt, both present in the

courtroom during closing statements, and Jesse Quackenbush, an attorney who also witnessed

the closing statements, all testified that during the colloquy, Mr. Murphy slammed the

Petitioner's confession on the bar of the jury box, wheeled and walked toward the Petitioner, and

spoke in a very loud voice in the direction of Petitioner.  Both Ms. Darnell and Ms. Evatt

believed that the offending statement of Mr. Murphy concerned the Petitioner's failure to testify.

Ms. Evatt noted that Mr. Murphy continued his argument even after he was interrupted by

Defense counsel's objection and the Court's ruling.  Jesse Quackenbush stated that he saw an

immediate reaction from five jurors, who all shifted in their seats soon after the comment was

made.

The foreman of the jury then testified for the State.  He stated that he remembered the challenged comment, the instruction to disregard, and was not aware of any violations of the court's instructions.[2]

## II.

### Procedural History

The jury convicted Petitioner of capital murder.  The same jury assessed his punishment to be death by lethal injection.  *State v. Davis*, No. 40,080-B (181st Dist. Ct., Potter County, Tex. March 27, 1999).  Petitioner filed a motion for new trial, which was denied on June 11, 1999 after hearing.   The case was appealed to the Texas Court of Criminal Appeals, which affirmed the conviction and death sentence in an unpublished opinion.  *Davis v. State*, No. 73,458 (Tex. Crim. App. Oct. 23, 2002).  Petitioner then filed a petition for writ of certiori to the United States Supreme Court, which was denied on February 28, 2003.  *Davis v. State*, 538 U.S. 1004 (2003).

Petitioner filed a state application for a writ of habeas corpus and request for an evidentiary hearing on June 17, 2002.  The trial court entered findings of fact and conclusions of law recommending that relief be denied on December 13, 2002.  On December 18, 2002, the

---

[2]  The Petitioner claims that the Testimony of the foreman should be excluded from consideration by the Court because it was obtained in violation of Texas Rule of Evidence 606 (b), which prohibits jurors from testifying as to matters which occurred during the jury's deliberations if the juror is testifying as to the validity of a verdict or indictment.  The trial court concluded that some testimony of the jury foreman should be excluded.  However, the trial court let in the above-mentioned testimony over the objection of counsel at the hearing. The Court of Criminal Appeals declined to address this claim on appeal because it had been inadequately briefed for the Court, therefore, and therefore not properly raised before the state court.  The court will consider only these admitted portions of the testimony.  Any objections to these portions of the record will be disregarded, as they have not been exhausted in the state court. (46 CR 80-7).

Court of Criminal Appeals entered an order on the basis of its review of the entire record.  *Ex parte Davis*, No. 54,457-01 (Tex. Crim. App. Dec. 18, 2002).  The court denied habeas relief on the basis of its earlier decision on direct appeal.

Petitioner filed this federal petition for writ of habeas corpus on July 31, 2003.  Respondent filed an answer on October 17, 2003, and furnished the state court records.

## III.

### Evidentiary Hearing Request

The Petitioner requested an evidentiary hearing before this Court.  However, the Petitioner has not pointed to any factual dispute that, if resolved would entitle him to relief, or requires further development before his habeas petition can be assessed.  *See Murphy v. Johnson*, 205 F.3d 809, 815 (5th Cir.), *cert. denied,* 531 U.S. 951 (2000); *Robinson v. Johnson*, 151 F.3d 256, 258 (5th Cir. 1998).  The facts were adequately developed at trial and in the subsequent motion for a new trial in the state court.  This Court does not deem an evidentiary hearing necessary for resolution of this matter.  The request for an evidentiary hearing is therefore DENIED.

## IV.

### Applicable Legal Standards

#### *Standard of Review*

Because this is a petition for writ of habeas corpus that was filed after April 24, 1996, and because the Texas courts addressed the merits of Petitioner's claim of error in his trial and

subsequent automatic appeal, this case is governed by the terms of the Antiterrorism and

Effective Death Penalty Act of 1996, 28 U.S.C.§ 2254(d) (2005) ("AEDPA"); *see also Green v.*

*Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).  Under the AEDPA, a federal court that hears the

review of a state case under habeas jurisdiction is to afford substantial deference to the judgment

of the state court.  *See Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  The Court is not to

impose the writ of habeas corpus simply because, in its independent judgment, it would have

reached a different conclusion than the state court.  *Id.* at 365.  Rather, the terms of the AEDPA

restrict the types of decisions that the Court may overturn.  The AEDPA provides that the Court

cannot issue the writ unless the state court's adjudication of the claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has been interpreted as limiting habeas court jurisdiction by creating three

separate standards of review for three different types of issues: pure questions of law, pure

questions of fact, and mixed questions of law and fact.  *Kettelson v. Dretke*, 426 F.3d 306, 318

(5th Cir. 2005).  First, according to § 2254(d)(2), all fact questions resolved by the state court are

presumptively correct, and will not be disturbed unless the petitioner can rebut this presumption

by clear and convincing evidence showing that the state court reached a decision "based on an

unreasonable determination of the facts in light of the evidence presented" in the state court

proceeding.  28 U.S.C. § 2254(d)(2), (e)(1).

With regard to pure questions of law, § 2254(d)(1), a state court decision may be

considered "contrary to" clearly established federal law, and therefore subject to the writ, in only two instances: if the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law, or if the state court decided a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 412-13 (2000); *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert.denied*, 534 U.S. 885 (2001).

On mixed questions of law and fact, a state court decision will stand unless it "unreasonably applies" clearly-established federal law, which happens only when the state court identifies the governing precedent, but unreasonably applies it to the facts of the particular case. *See Williams*, 529 U.S. at 407. The state court must do more than apply federal law "erroneously or incorrectly"; its determination must be objectively unreasonable. *Id*. at 411; *Penry  v. Johnson*, 532 U.S. 782, 793 (2001).

In this habeas petition, the Court will review both the legal conclusions of the Texas Court of Criminal Appeals, as well as mixed fact and legal questions.

### *Fifth Amendment Protection*

The right to refuse to testify at trial, embodied in the Fifth Amendment and applied against the states through the Fourteenth Amendment, is one of the most fundamental protections afforded a criminal defendant in the American judicial system. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990); *Dickerson v. United States*, 530 U.S. 428, 440 n. 4 (2000); *United States v. Johnson*, 127 F.3d 380, 398 (5th Cir. 1997). The United States Supreme Court held in *Griffin v. California* that the prosecution is absolutely forbidden from making any

reference to a defendant's decision not to testify.  380 U.S. 609, 615 (1965).  Nevertheless, a defendant challenging a guilty conviction on the basis of such prosecutorial misconduct bears a heavy burden in obtaining a reversal of conviction, and an even heavier burden on collateral review of the conviction in an application for habeas relief.[3]  Improper conduct by the prosecutor alone, even if in violation of the Constitution, will not require reversal of a conviction.  *See United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1994) (citing *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990)); *see also Chapman v. California*, 386 U.S. 18 (1967).  To succeed in challenging the prosecution's conduct on habeas review, a defendant must also show that such an unlawful comment by the prosecution ultimately casts a "substantial and injurious effect or influence on the jury's verdict."  *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) ; *see also United States v. Johnson*, 127 F.3d 380, 398 (5th Cir. 1997) (citing *United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994)).  This is often called the "harmless error" analysis. *Chapman v. California*, 386 U.S. 18, 22 (1967); *see also Sullivan v. Louisiana*, 508 U.S. 275, 278-79 (1993).

## V.

## Analysis

The Texas Court of Criminal Appeals has already determined that the Prosecution's comment violated Petitioner's Fifth Amendment rights.[4]  The issue of the propriety of the

---

[3]  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993) (differentiating the standards for reviewing harm on direct appeal and habeas review).

[4] Because the Texas Court of Criminal Appeals did not consider the merits of Petitioner's case when it considered Petitioner's state habeas petition, it is that court's decision on direct appeal, that will be analyzed here.

prosecutor's comment is not now before the Court.   Therefore, to succeed, the Petitioner must show that the Texas court's decision that the comment was harmless is contrary to, or involved an unreasonable application of, clearly established federal law.

The Texas Court found that no harm came from the Prosecution's impermissible argument.  *Davis v. State*, No. 73,458 (Tex. Crim. App. Oct. 23, 2002).  It analyzed the case under the standard for harmless error set forth by the United States Supreme Court in *Anderson v. Nelson*, 390 U.S. 523, 524 (1968).  Under the *Anderson* standard, "comment on a defendant's failure to testify cannot be labeled harmless error in a case where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal.  *Id.*

The Fifth Circuit has long subjected comments on the defendant's silence to the same general test the Fifth Circuit uses for determining the harm caused by all other forms of prosecutorial misconduct.  *United States v. Johnson*, 127 F.3d 380, 398 (5th Cir. 1997) (deriving this test from *United States v. Bermea*, 30 F.3d 1539, 1563 (5th Cir. 1995), which concerned facial expressions and inflammatory comments made by the prosecutor); *Ochoa Cochrell*, 37 Fed. Appx. 90 (5th Cir. 2002) (not designated for publication) (following the Fifth Circuit's opinion in *United States v. Palmer*, 37 F.3d 1080  (5th Cir. 1994)); *see also United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990); *United States v. Casel*, 995 F.2d 1299 (5th Cir. 1993); *Samuels v. United States*, 398 F.2d 964, 970 n.5 (5th Cir. 1968) (citing *Anderson*).  Under that test, measuring the harm caused by any form of prosecutorial misconduct requires examining three separate factors: "the magnitude of the prejudicial effect of the remark, the efficacy of any cautionary instruction, and the strength of the evidence of the defendant's guilt."

*Johnson*, 127 F.3d at 398; *Bermea*, 30 F.3d at 1563; *Palmer*, 37 F.3d at 1085.

The Texas court noted first that the presumption that an instruction will not generally cure a comment on the failure of the accused to testify had been eroded to the point where it applied only to the most "blatant examples." *Davis v. State*, No. 73,458 at 4 (Tex. Crim. App. Oct. 23, 2002). The Texas court then held that even assuming arguendo that the trial court's instruction to disregard did not cure the improper comment, the comment was harmless error. The court stated "This entailed a single comment, the emphasis of the State's argument was the evidence, and there was no evidence that supported acquittal." *Id.* at 5.

The Petitioner contends here that, contrary to the position of the Texas Court, the comment in question substantially and injuriously affected his right to a fair trial and contributed both to a guilty verdict and the imposition of a death sentence.

Harm on the Guilt Phase

The Fifth Amendment protection of the Defendant is at the core of or criminal trial system.  The State bears a responsibility to protect the right of the Defendant.  The prosecutor, as the instrument of the state's policy, is bound to protect these rights, having sworn to uphold the Constitution of the United States.  This is especially true where a criminal defendant's life is at stake.  However, as serious as this violation is, this Court finds that the Texas court's decision that the prosecution's error did not substantially and injuriously effect the verdict of guilt was not an unreasonable interpretation of federal law.

Given the brevity of the comment, the lack of evidence to support an acquittal and the

overwhelming evidence of guilt in this case, it is not likely that the prejudicial effect of the prosecution's comment was significant.  As the Texas court noted, it was merely a single comment by the prosecution, and the trial court promptly ordered the jury to disregard the comment.  Of course, even a single comment by a prosecutor can be sufficient to constitute error.  *See Johnson*, 1276 F.3d at 402.  However, the emphasis of their case, as well as the emphasis in the comment itself, was on the strength of the evidence.  It was clear that the Prosecution did not rely on an inference of guilt from the Petitioner's silence.  To the contrary, the great thrust of the prosecution's case was the strength of the evidence, including evidence given by the Petitioner himself in his confession.

The strength of the evidence against the Defendant as well as the other factors supports the finding that the prosecutor's comment was harmless error.  The Prosecution offered both physical evidence from the scene of the crime and testimony from numerous other witnesses that confirmed Petitioner's role in the affair.  And the best evidence against the Petitioner came from the confession that he signed with no suggestion of coercion.  Not only did Petitioner's statement match the physical and testimonial evidence, but it provided more than enough grounds to convict him of capital punishment.  As both the judge and the prosecutor instructed the jury, the Petitioner could be convicted by either finding that he'd actually committed the murder (by stomping on Barrow's chest) or as a party to felony murder (by merely aiding the murder and participating in the robbery).  The evidence supported conviction of capital murder even if the very best case of the Defense were true - that his confession was largely false, and he had left the house with numerous items of stolen property before the actual killing took place.  *See* Tex. Pen. Code § 19.03(a)(3) (Vernon 2006).  He had knowledge of the other parties' intent to kill

Barrow, and that murder was committed during the course and in furtherance of the robbery in which he participated.  Therefore, the Texas court's decision finding harmless error during the guilt phase was not an unreasonable determination of the facts in light of the evidence presented, nor was it an unreasonable application of clearly-established federal law as determined by the Supreme Court of the United States.

Harm During Punishment

The Petitioner claims that the Prosecution's comment also had a substantial and injurious effect on the punishment phase of the trial.  The state responds that Petitioner never advanced this position before a Texas court, and should therefore be procedurally barred from advancing it here.

In order to be considered by a federal habeas court, a habeas petitioner's claim must be "fairly presented to the state courts" or else the habeas petitioner will be found to have failed to exhaust his state remedies.  *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990) (citing *Rose v. Lundy*, 455 U.S. 509 (1982)).  Therefore, where a petitioner raises for the first time new legal theories, or supports existing claims with factual allegations that were not raised in the state court, those claims or theories will be dismissed.  *See Dispensia v. Lynaugh*, 847 F.2d 211, 217-18 (5th Cir. 1988).  The consequences of failing to exhaust state remedies may also be worse than mere dismissal without prejudice.  If a petitioner is found to have failed to exhaust his state remedies, the petitioner is deemed to have forfeited his claim entirely if the state court to which he would be required to petition would now find the claim procedurally barred.  *See Bledsue v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999).

On appeal to the Texas Court of Criminal Appeals, the Petitioner argued the following:

> Under Rule 44.2 the reviewing court is to disregard the error unless it affects substantial rights. A substantial right is affected when the error had a substantial injurious effect or influence on the *verdict*. The court is to review the record as a whole to determine whether the error had a substantial influence on the *verdict*. It is not sufficient nor right to determine harmfulness by simply examining whether there is overwhelming evidence in support of the *verdict of conviction*. Even though the evidence may be sufficient to support the *verdict*, consideration must be paid to the source and nature of the error, severity of the misconduct, its probable collateral implications (e.g. likelihood of continued repetition by the offending party), and likelihood of *conviction upon the indictment* in the absence of the misconduct.

*See* Petitioner's Brief to the Texas Court of Criminal Appeals at 18.  (internal citations omitted and emphasis added).[5]  The position  Petitioner advanced in the state court raised the effect of the prosecution's comment on the verdict of guilty.  It did not raise the issue of the effect of that comment on the punishment phase.  Thus, the Petitioner has failed to exhaust his state claims.

He is now in procedural default if he would be precluded from raising his claim before the Texas courts at this point.  Article 11.071 of the Texas Code of Criminal Procedure prohibits claims from being raised in a subsequent habeas application unless:

_____

[5]  There might be some reason for concern that Petitioner may have chosen to phrase the inquiry narrowly because of the procedural constraints of Texas law, rather than his true position. A habeas petitioner should not be penalized if he would not have been permitted to raise his arguments in the state courts due to state rules.

In this portion of his brief (the only portion which articulates the boundaries of his position on the harm analysis) the Petitioner cites only Texas cases's interpretation of federal law and Texas Rule of Appellate Procedure 44.2.  While the Texas cases cited by the Petitioner framed the constitutional inquiry narrowly, only in terms of the influence on the "verdict," Rule 44.2 frames the inquiry more broadly, in terms of "conviction *or* punishment." Tex. R. App. Proc. 44.2 (emphasis added); *see King v. State*, 953 S.W.2d 266 (Tex. Crim. App. 1997); *Morley v. State*, 983 S.W.2d 249, 254 (Tex. Crim. App. 1998) (op. on reh'g.); *Orona v. State*, 791 S.W.2d 125, 129-30 (Tex. Crim. App. 1990); *Hall v. State*, 13 S.W.3d 115, 119 (Tex. Ct. App.– Fort Worth, 2000, no pet.).  As such, his articulation of the scope of inquiry was his conscious choice in framing a legal theory, and not a consequence of the fact that he was appealing Texas law.

(1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

(2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or

(3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial.

*See* Tex. Code. Crim. Proc. Ann. Art 11.071 § 5(a) (2005).  The factual and legal basis for a claim of harm during the penalty stage was clearly available to Petitioner at the time of the state proceedings.

Clearly it is not the case that, but for the constitutional violations, "no rational juror" could have found the Petitioner guilty or imposed the death penalty.  The Court has already reviewed the overwhelming evidence of guilt presented at trial.  The evidence in favor of imposition of the death penalty was equally compelling.  While jurors were informed of Petitioner's Bible Studies and artistic achievements during prison, they also heard evidence of the Petitioner's criminal history and other incidences of extreme violence.  Prosecutors presented evidence that Petitioner had been implicated in another murder before he was brought to trial for Barrow's death, had committed an armed robbery after Michael Barrow's death, and during his numerous stints in prisons for other convicted offenses, which included weapons charges and financial crimes, failed to follow jail rules and had violated parole.  The Prosecutors also offered evidence that Petitioner had been severely abusive to his wives, girlfriends and children. The evidence presented amply supported a finding that the Petitioner constituted a future danger to

society.  Given the ample evidence in favor of the jury's finding, it cannot be said that "no rational juror" could have assessed the death penalty in the absence of the prosecutor's comment. The Court finds that the Petitioner is barred from presenting this claim before the Court.

Even if the Court were to consider the merits of this claim, this same evidence presented in favor of procedural default clearly demonstrates that the prosecutor's statement did not have a substantial and injurious effect on the punishment phase of the trial.  Where, as here, no substantial harm arose from the comment during the guilt phase, it is even less likely that the same comment caused harm in the punishment phase, especially after the jury was exposed to yet another cautionary instruction at the commencement of the penalty phase that the Petitioner's silence could not be taken against him.

## Conclusion

Considering the overwhelming evidence of guilt against the Petitioner, and the minimal prejudicial effect of the comment itself, it is clear that the Texas court's interpretation of federal law was not was not an unreasonable determination of the facts in light of the evidence presented, nor was it an unreasonable application of clearly-established federal law as determined by the Supreme Court of the United States.  The comment was not extensive, an inference from guilt from silence was not stressed to the jury as a basis of conviction, and there is virtually no evidence that would have supported acquittal.  On the contrary, the evidence of Petitioner's guilt was overwhelming.  The trial court promptly and later in the Court's charge properly instructed the jury to disregard the comment.  The error did not have a substantial and injurious effect on the Petitioner's case.  The petition for habeas corpus should be DENIED.

It is SO ORDERED.

Signed this __31st__ day of July, 2006.

/s/ Mary Lou Robinson
**MARY LOU ROBINSON**
**UNITED STATES DISTRICT JUDGE**